Town of Andover & another[1] vs. Energy Facilities Siting Board & others.[2]

Suffolk. September 6, 2001. - November 19, 2001.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, & Sosman, JJ.

*Energy Facilities Siting Board. Administrative Law,* Decision, Findings, Substantial evidence, Hearing, Standing.

In a civil action appealing the decision of the Energy Facilities Siting Board (board) approving the construction of an electrical generating facility, this court concluded that the board's decision was sufficiently final; the board did not improperly delegate to the Department of Environmental Protection its responsibility to establish final, binding emissions limits for the proposed facility in requiring the petitioner to return for further hearings if the department's findings were substantially different from its own, and the board's findings regarding turbines, emissions control technology, noise, health impacts, and total emissions were properly limited to its statutorily mandated scope of inquiry. [379-386]

In a civil action appealing the decision of the Energy Facilities Siting Board (board) approving the construction of an electrical generating facility, this court concluded that the board's decision and subsidiary findings regarding air emissions, minimization of environmental impacts, noise, traffic safety issues, and future decisions by the Department of Environmental Protection were supported by substantial evidence. [386-393]

In administrative proceedings before the Energy Facilities Siting Board (board) to consider a petition to construct an electrical generating facility, the board's review of the petitioner's site selection process was properly limited to a determination whether the description of the site selection process used was accurate. [393]

In administrative proceedings before the Energy Facilities Siting Board (board) to consider a petition to construct an electrical generating facility, the board's preclusion of cross-examination or discovery into particular areas of testimony was proper. [393-395]

In administrative proceedings before the Energy Facilities Siting Board to consider a petition to construct an electrical generating facility at a particular site, the petitioner was not required to secure an ownership, leasehold, or other interest in the selected site in order to have standing to petition for a permit to construct the proposed generating facility. [395]

Civil action commenced in the Supreme Judicial Court for the county of Suffolk on December 20, 2000.

[1]Merrimack Valley Residents for the Environment, Inc.

[2]Nickel Hill Energy, LLC, and town of Dracut.

The case was reported by *Sosman, J.*

*Robert J. Muldoon, Jr. (David A. Brown & Philip H. Graeter* with him) for town of Andover.

*S. James Boumil, Jr.*, for Merrimack Valley Residents for the Environment, Inc.

*William E. Reynolds*, Assistant Attorney General, for Energy Facilities Siting Board.

*David S. Rosenzweig (Erika J. Hafner* with him) for Nickel Hill Energy, LLC.

*J. Raymond Miyares*, for town of Dracut, was present but did not argue.

SPINA, J. The Energy Facilities Siting Board (board) approved the petition of Nickel Hill Energy, LLC, to construct and operate a 750-megawatt natural gas-fired, combined cycle electrical generating facility on a twenty-five acre site in the town of Dracut. The town of Andover and Merrimack Valley Residents for the Environment, Inc., interveners in the administrative proceedings below,[3] appealed from the decision of the board to a single justice of this court, pursuant to G. L. c. 25, § 5, and G. L. c. 164, § 69P. The single justice reserved and reported the case to the full court.

On appeal the interveners argue that (1) the board's decision improperly relies on future actions by other agencies and thus is not a final agency decision; (2) the board's decision and subsidiary findings are not supported by substantial evidence; (3) the board improperly limited its review of the site selection process to whether Nickel Hill's description of the process was accurate; (4) the board violated the interveners' procedural rights; and (5) Nickel Hill lacked standing to pursue its petition because it did not have a property interest in the selected site. We affirm the decision of the board.

1. *Scope of review.* Our review of the board's decision is governed by the provisions of G. L. c. 25, § 5, and G. L. c. 164, § 69P. Section 69P states that "[t]he scope of such judicial review shall be limited to whether the decision of the board is

---

[3]The interveners were granted full party status by the hearing officer, a decision that has not been challenged on appeal. Cf. *Tofias* v. *Energy Facilities Siting Bd.*, *ante* 340 (2001).

in conformity with the constitution of the commonwealth and the constitution of the United States, was made in accordance with the procedures established under [G. L. c. 164, § 69H-§ 69O,] and with the rules and regulations of the board with respect to such provisions, was supported by substantial evidence of record in the board's proceedings; and was arbitrary, capricious or an abuse of the board's discretion under the provisions of [§ 69H] to [§ 69O]." The party appealing from a decision of the board bears the burden of showing that the decision is invalid. See G. L. c. 25, § 5.

2. *The finality of the board's decision.* The interveners argue that the board's decision should be vacated because it is not sufficiently final. They contend that the board failed to make findings regarding certain environmental impacts, and that the board improperly relied on future actions by the Department of Environmental Protection (department) and other contingencies in lieu of making these findings. The interveners rely on *Point of Pines Beach Ass'n* v. *Energy Facilities Siting Bd.*, 419 Mass. 281 (1995), for the proposition that only a final decision may be upheld. There we vacated a decision where the board had concluded that it was "unable to determine that the proposed project is needed to provide a necessary energy supply for the Commonwealth," an ultimate finding required by G. L. c. 164, § 69J, for nongenerating facilities. *Id.* at 285-286. The board, unlike in the *Point of Pines Beach Ass'n* case, did not fail to make ultimate findings. Its decision was final.

General Laws c. 164, § 69J¼, which governs petitions for construction of generating facilities,[4] requires the board to conduct an evidentiary hearing on a petition to construct a generating facility within 180 days of filing, and to approve a petition within one year of filing if it "determines that the petition meets the following requirements: (i) the description of the proposed generating facility and its environmental impacts are substantially accurate and complete; (ii) the description of the site selection process used is accurate; (iii) the plans for the construction of the proposed generating facility are consistent with current health and environmental protection policies of the

---

[4] A generating facility is defined as one "designed for or capable of operating at a gross capacity of 100 megawatts or more." G. L. c. 164, § 69G.

commonwealth and with such energy policies as are adopted by the commonwealth for the specific purpose of guiding the decision of the board; (iv) such plans minimize the environmental impacts consistent with the minimization of costs associated with the mitigation, control, and reduction of the environmental impacts of the proposed generating facility; and (v) if the petitioner was required to provide information on other fossil fuel generating technologies, the construction of the proposed generating facility on balance contributes to a reliable, low-cost, diverse, regional energy supply with minimal environmental impacts." We turn to the points that the interveners contend were wanting, addressing first their general, and primary, issue.

(a) *Delegation of responsibility.* The interveners claim that the board improperly delegated its responsibility under § 69J$\frac{1}{4}$ to the department when it said that "[f]inal, binding, emissions limits for the proposed facility will not be established until [the department] issues its final air plan approval." Far from constituting a delegation, the statement is an accurate observation of the different roles of the board and the department in the over-all permit process. The board concluded that the department "may not [issue its final air plan approval] until after the [board] issues *its final approval*" (emphasis added). A permit issued by the board is only the first of many permits and licenses that will be required of a developer of a generating facility, and no other State agency may issue a construction permit for a generating facility until it first has been approved by the board. See G. L. c. 164, § 69J$\frac{1}{4}$, first par.

As to the specific contention of the interveners, the role of the board in this case with respect to air emissions is limited to a review of Nickel Hill's description of the environmental impacts of the proposed generating facility for substantial accuracy and completeness, and a determination whether Nickel Hill's construction plans minimize the environmental impacts consistent with the minimization of costs associated with the mitigation, control, and reduction of the environmental impacts of the proposed facility. See G. L. c. 164, § 69J$\frac{1}{4}$, fifth par. Nickel Hill's descriptive accuracy of the environmental impacts of its proposed generating facility and its plans to minimize those impacts consistent with the cost of mitigation may satisfy

the board, but it will not necessarily satisfy the emission standards established by the department pursuant to G. L. c. 111, § 142D. See 310 Code Mass. Regs. §§ 7.00, 7.02 & Appendix A (2001). After the board issues its permit, the department must determine how the proposed generating facility may operate, and under what conditions.

The board neither delegated nor abdicated its responsibility to establish "final, binding emissions limits for the proposed facility" because it never had that authority. Regulation of the actual emissions of the proposed facility is a matter within the jurisdiction of the department, not the board, and it will be determined on Nickel Hill's petition for a major comprehensive air plan, without which the facility may not operate. See 310 Code Mass. Regs. § 4.10 Appendix at (2) (c) (BWPAQ03) (2001); 310 Code Mass. Regs. § 7.02 (2) (a). The board also correctly stated, referring to "SCONO$_x$ technology" (see discussion, *infra* at 383), that because the department's "primacy of jurisdiction and . . . its greater expertise in emissions control technologies, [it] is the agency best suited to determine whether and when to introduce new emissions control technologies into the Commonwealth." In point of fact, it is *the* State agency to make that determination. See G. L. c. 111, § 142D; 310 Code Mass. Regs. §§ 7.00, 7.02 & Appendix A.

Section 69J$^1$/$_4$ anticipates the role of the department in the broader process, one which is by no means subservient to, or duplicative of, the role of the board. Illustrative is the requirement in § 69J$^1$/$_4$ that the board establish a technology performance standard (TPS) for pollutants reflecting the best available control technology (BACT) or the lowest achievable emissions rate (LAER) for each pollutant, as applicable for each year. The TPS "shall reflect emission rates that are achievable by state of the art fossil fuel generating and control technologies, *as demonstrated by air permits for construction that have been issued by the [department]. The promulgation or application of this standard shall not in any way supersede or impair the authority of the [department] with respect to these or other facilities*" (emphasis added). G. L. c. 164, § 69J$^1$/$_4$, second par. The legislative scheme contemplates that much of what the board does in the area of air pollution will be dependent on

decisions of the department, which has a significant and independent role in the permit process for new generating facilities. See G. L. c. 111, § 142D; 310 Code Mass. Regs. §§ 7.00, 7.02 & Appendix A.

The fact that the department has the "final" decision governing the specific emissions limits for regulated pollutants, the precise technology that will be used to achieve those limits, and the allowable offset plans, and thereby ultimately will determine whether the proposed generating facility can start its turbines and keep them running, does not mean that the findings made by the board are not final for purposes of review under G. L. c. 164, §' 69P. The board made the ultimate findings required by § 69J¼ and thus has appropriately performed the role carved out for it by the Legislature. The board's requirement that Nickel Hill return for further hearings if the department's findings are substantially different from its own can hardly be viewed as an abdication. It is an acknowledgment that its decision may need to be modified to reflect more stringent requirements determined by the department, and thus it is sensible administrative coordination with the agency ultimately responsible for regulating the actual and specific air emissions from the proposed generating facility, and with other agencies that may rely on the board's decision regarding the descriptive accuracy of Nickel Hill's plans.

(b) *Turbines.* The interveners contend that the board failed to make a finding about the turbines to be used or their emission rates. Nickel Hill's description of the proposed facility, required under § 69J¼, third par., stated that two Siemens-Westinghouse or Mitsubishi Heavy Industries "G" technology combined-cycle combustion turbines with steam injection capability and two 170-foot stacks, two heat recovery steam generators, one steam turbine generator, and a wet mechanical cooling system would be used, together with a selective catalytic reduction (SCR) system for nitrogen oxides ($NO_x$) control and an oxidation catalyst for carbon monoxide control (CO). The proposed facility would burn only natural gas. The board's finding that the facility would make use of "G" technology combined-cycle combustion turbines with steam injection capability sufficiently identifies the turbines. Because there is no significant difference

in unit emissions between the "G-class" turbines of the two manufacturers, it was not necessary to further specify the manufacturer. With evidentiary support from the description of the turbines, the board made the requisite ultimate finding that the description of the proposed generating facility was substantially accurate and complete. See G. L. c. 164, § 69J¼, fifth par.

There is no requirement that the board make findings as to emissions rates of turbines.[5] It need only make the statutory findings as to the facility itself. See *id.* Nickel Hill submitted voluminous and specific evidence of expected emissions of air pollutants from the facility based on the combined use of all proposed equipment and mitigation measures, including the turbines, the SCR system, the full GEP (good engineering practice) stack height of 170 feet, and the exclusive use of natural gas as fuel. See G. L. c. 164, § 69J¼, third par. The board found that the expected emissions from the proposed generating facility do not exceed the board's technology performance standard (TPS) specified in 980 Code Mass. Regs. §§ 12.00 (1998). See G. L. c. 164, § 69J¼, second par. The board concluded that Nickel Hill's description of the air quality impacts of the proposed generating facility were substantially accurate and complete, and that they would be minimized. These ultimate findings were supported by the evidence and are final for purposes of review under G. L. c. 164, § 69P.

(c) *Emissions control technology.* There is no merit to the claim that the board failed to make findings concerning the emissions control technology to be installed. The interveners fault the board for failing to require Nickel Hill to evaluate zero-ammonia SCONO$_x$ technology. Evidence was presented both by Nickel Hill and by the interveners on the subject of SCONO$_x$ technology. That evidence indicated that although SCONO$_x$ technology had achieved the lowest achievable emission rate (LAER) for NO$_x$, its use had not been demonstrated to

---

[5]Evidence was presented that the department had approved "G" technology turbines for two combined-cycle projects using turbines manufactured by Mitsubishi Heavy Industries, and that Mitsubishi had committed to emissions of volatile organic compounds (VOC) of less than one part per million (ppm), a subject of particular concern to the interveners.

be reliable in large-scale facilities such as the one proposed by Nickel Hill. The capital outlay and maintenance cost requirements of $SCONO_x$ technology are also considerably higher than those of SCR technology, and the department had recently determined in three other cases that SCR is more cost-effective than $SCONO_x$ and thus was the best available control technology (BACT) for achieving LAER for $NO_x$. Moreover, $SCONO_x$ technology was not without its disadvantages. It requires more water than the SCR technology, it would increase the downtime of the facility because of its additional maintenance requirements, and it would reduce plant efficiency. The board concluded that "the record does not support a finding that the use of $SCONO_x$ would minimize the environmental impacts of the proposed generating facility, consistent with minimizing the costs associated with the mitigation, control and reduction of environmental impacts. As a result, the [board] will not require use of such technology as a condition of this approval." In deciding this case the board properly looked to the department decisions for current standards of BACT and LAER. The board has no authority to make an independent determination of BACT and LAER. See G. L. c. 164, § 69J¼, second par. The matter was given appropriate consideration, and necessary findings regarding minimization of impact were made by the board. The findings had evidentiary support and were final.

(d) *Noise.* The interveners next contend that the board failed to make any findings about noise pollution control measures, in particular, the noise control technology that Nickel Hill intends to install on site. Nickel Hill proposed several noise mitigation measures that the board found would minimize the noise impacts of the proposed facility, consistent with minimization of the cost of mitigation, as required by § 69J¼. Those measures include: enclosure of the combustion turbines, the steam turbines, and the heat recovery steam generators; use of mufflers for air inlets and exhaust on the combustion turbines; noise controls to limit cooling tower noise to forty-eight decibels (dBA) at a distance of 400 feet; acoustic louvers on ventilation air inlets on the north, east, and south sides; mufflers on roof exhaust fans; enclosure or wrapping of pressure reduction valves and exposed pipes associated with gas metering equipment;

purchase of low noise transformer equipment, or, in the alternative, use of noise barrier walls to reduce noise impacts of transformers; and enclosure of circulating water pumps and the water pump station. The board found that the proposed facility would produce only modest noise increases at the nearest residential properties, which it limited to no more than ten dBA above ambient noise levels at the property line of the proposed facility. Although approval was conditioned on periodic monitoring with reporting requirements to the Dracut board of health, the board made the necessary findings on this issue, and the findings had evidentiary support.

(e) *Health.* The interveners claim that the board failed to make findings concerning the health impacts of the proposed generating facility, noting that the Department of Public Health had requested Nickel Hill to conduct additional modeling to address public health concerns about pediatric asthma. The request of the Department of Public Health for additional modeling came during the course of, but outside the scope of, the environmental review process under G. L. c. 30, §§ 61-62H, the Environmental Protection Act. See *Enos* v. *Secretary of Envtl. Affairs,* 432 Mass. 132, 136-139 (2000). The hearing officer ruled that the evidence expected from the additional modeling was beyond the scope of the hearing before the board, and noted that it would not even be available until years after the time the board must issue its decision under § 69J$^1$/$_4$. The interveners have not argued that the ruling was incorrect. The issue is deemed waived. Nevertheless, the request to conduct additional modeling did not diminish the finality of the board's findings.

It bears mentioning that the board devoted twenty-four pages of its 149-page decision to the cumulative health impacts of the proposed generating facility, including the issue of pediatric asthma. The board found that the cumulative impacts from expected criteria pollutant emissions under national ambient air quality standards[6] (NAAQS) would be minimized by compliance with BACT or LAER, as applicable, to $NO_x$ and volatile organic compounds (VOC) emissions, and by obtaining offsets

---

[6]See 40 C.F.R. Part 50 (2001). The department has adopted the same standards. See 310 Code Mass. Regs. §§ 6.00 (1994).

or allowances that may be required by the department under its new source review for $NO_x$ and sulfur dioxide ($SO_2$) emissions. See 310 Code Mass. Regs. §§ 7.00 Appendix A. The board further found that, because natural gas would be the exclusive fuel used, expected emissions of noncriteria pollutants, including mercury and lead (also a NAAQS criteria pollutant), of special concern in Lawrence, would not exceed applicable ambient limits for those substances. The board gave careful attention to these concerns and made detailed findings regarding public health impacts, all of which had evidentiary support.

(f) *Total emissions.* Last, the interveners claim that the board failed to make ultimate findings about total emissions from the facility. They contend that Nickel Hill admitted that its data were negotiable and that it did not provide "firm" data about the facility's emissions. One witness for Nickel Hill explained that its original estimates were preliminary and that further information would be provided as the review process progressed and as negotiations progressed with the manufacturers of the relatively new "G-class" technology. The board expressly accepted this explanation, noting that "changes in emissions estimates are not unexpected during the early stages of the permitting process, as a developer works with its equipment vendors to meet the information and performance requirements of this agency." After reviewing the voluminous record, we conclude that the evidence on which the board rested its decision was appropriately reliable and had substance from which the board could responsibly find that Nickel Hill's description of the proposed generating facility and its environmental impacts were substantially accurate and complete. Thus, the board made the required ultimate finding.

3. *Substantial evidence.* The interveners argue that the board's decision and subsidiary findings in five areas were not supported by substantial evidence. See G. L. c. 164, § 69P. The hearings before the board were conducted in accordance with the provisions of G. L. c. 30A. See G. L. c. 164, § 69J¼, fourth par. In that context, substantial evidence is evidence that "a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1 (6). See *Save the Bay, Inc.* v. *Department of Pub. Utils.*, 366 Mass. 667, 678 (1975). We address the interveners' specific claims under this standard.

(a) *Air emissions.* The interveners' arguments touch on several specific points that correspond, in large part, to those raised in the previous discussion of ultimate issues. They contend that Nickel Hill's description of the facility and its emissions was not "substantially accurate and complete," G. L. c. 164, § 69J$\frac{1}{4}$, because its estimates of several pollutants, namely carbon monoxide, VOC, particulates, and ammonia varied over the course of the proceedings. Nickel Hill's explanation for the variations, which the board accepted, has been discussed, *supra* at 386. The final estimates, devised after months of consultation with various experts, were Nickel Hill's highest estimates. The issue is one of credibility that the board resolved in favor of Nickel Hill. The board found that, even at the levels expressed in Nickel Hill's final estimates, which the interveners have not shown to be invalid, emissions from the facility are below the board's TPS thresholds, although that finding may only be used to determine if alternative fossil fuel technologies will be required. See G. L. c. 164, § 69J$\frac{1}{4}$, second par.; 980 Code Mass. Regs. § 12.03 (1998).

The interveners also claim that there are inconsistencies between estimates of Nickel Hill and Siemens-Westinghouse, one of its potential vendors of the "G-class" turbines, as to $NO_x$ emissions. There are no inconsistencies. Siemens indicated that $NO_x$ emissions from the "G-class" turbines would be 2.5 ppm. Nickel Hill stated that $NO_x$ emissions from the generating facility would be two ppm. Nickel Hill's estimate was based on the use of supplemental SCR technology if Siemens-Westinghouse could not guarantee $NO_x$ emissions of two ppm. A similar result obtains for the interveners' contention regarding VOC emissions of one ppm, the LAER for VOC consistent with recent department approvals. Nickel Hill was committed to working with the selected "G" turbine manufacturer to ensure that LAER for VOC could be met. The board required Nickel Hill to meet all of its estimates as a condition of the permit. There was substantial evidence to support the board's findings.

The interveners contend that, because Nickel Hill's natural gas supplier would only guarantee a sulfur content of not less than twenty grains of sulfur per one hundred cubic feet of gas, Nickel Hill's reliance on a sulfur content of 1.07 grains per one

hundred cubic feet is unfounded. The interveners misconstrue the evidence that was presented. The uncontroverted evidence indicated that the twenty-grain guarantee is for tariff purposes only, and it is not an indication of the actual sulfur content of the fuel. Moreover, Nickel Hill will be required to stay within the $SO_2$ emissions estimates calculated on its statement of the sulfur content of the fuel.

The interveners also misconstrue the evidence regarding the effect of plant startups due to maintenance, estimated by Nickel Hill to be approximately twenty "hot starts" (startups following a shutdown of less than two days) each year, up from a preliminary estimate of six "hot starts." Nickel Hill offered testimony that there would be no significant environmental impact between six and twenty "hot starts," in contrast to the negative impact of "cold start" (startups following a shutdown of more than three days). There was no contrary testimony. On appeal, the interveners contend that, without differentiating between "hot" and "cold starts," startups would have an impact. The argument is in the abstract and it is not based on testimony about the operation of the proposed generating facility. Similarly unpersuasive is the claim that Nickel Hill changed its position about the increase in the number of "hot starts" based solely on general discussions. The discussions were anything but general, as the testimony indicated. A team of experts had been engaged in an ongoing process over a period of several months, constantly reevaluating new and changing data regarding the capability of the advancing technology. Contrast *Massachusetts Mun. Wholesale Elec. Co.* v. *Energy Facilities Siting Council*, 411 Mass. 183, 199-200 (1991). The board could properly rely on this testimony, and we must give "due weight to the experience, technical competence, and specialized knowledge" of the board. G. L. c. 30A, § 14 (7). See *id.* at 199. The interveners have failed to show that the board's decision as to air emissions was invalid.

(b) *Minimization of environmental impacts (air quality).* The interveners argue that the evidence does not support the board's finding that the air quality impacts of the proposed generating facility would be minimized. The interveners imply that minimization means that the proposed facility must be shown to

produce no more than an indiscernible environmental impact. The statute contains no such requirement. The standard under § 69J¼ requires that plans for the proposed generating facility minimize its environmental impacts "consistent with the minimization of costs associated with the mitigation, control, and reduction of [those] environmental impacts." The board's findings clearly indicate that any negative air quality impacts would be minimized in accordance with the statute.

The board found that Nickel Hill had incorporated measures specifically designed to reduce emissions, including the use of natural gas as fuel, a full GEP stack height of 170 feet, and the SCR system. The board noted that the proposed generating facility would be required to achieve LAER for $NO_x$ and VOC emissions, and to employ BACT for CO, $SO_2$, and particulate matter ten microns or less in size, with the precise emission rates to be determined by the department.

The board further found that Nickel Hill had used accepted air modeling protocols to estimate the level of various pollutants that will be in the air when the proposed generating facility is in operation, that the facility "would not cause local air quality to significantly worsen, as compared to established air quality standards," and that "impacts from the proposed facility would be below SILs [significant impact levels] for all [NAAQS] criteria emissions." The board concluded that the use of natural gas as the exclusive fuel, combined with the 170-foot stack height, would minimize $SO_2$ impacts in Lawrence, a finding the interveners do not challenge. Contrary to the interveners' assertion, the board did not rely on Nickel Hill's intention to make use of offsets and displacement of older power plants in reaching its conclusion.[7]

The board also required Nickel Hill to devise a specific mitigation measure with respect to carbon dioxide ($CO_2$) because $CO_2$ is the only pollutant emitted by new generating facilities that is not regulated by the department. See 310 Code

[7]Generally, an "offset" is a type of credit, approved by the department, that would permit a proposed facility to exceed allowable levels of emissions of a particular pollutant in exchange for a reduction of the same or another pollutant at the same or some other facility, and producing a net air quality benefit in the affected area. See 310 Code Mass. Regs. §§ 7.00 Appendix A.

Mass. Regs. §§ 6.00, 7.00. The board's findings with respect to minimization of environmental impacts of the proposed generating facility, consistent with the minimization of costs associated with the mitigation, control, and reduction of its environmental impacts, were supported by substantial evidence.

(c) *Noise.* The interveners challenge the adequacy of the board's finding that Nickel Hill's plan minimizes noise impacts consistent with minimizing the cost of mitigation. The evidence showed that the operation of the proposed generating facility would result in a maximum increase of six decibels (dBA) over existing noise levels at the closest residences to the north, northeast, and southeast, and a maximum increase of four dBA at another residence to the southeast, using a measure of the sound level that is exceeded ninety per cent of the time. An increase of three dBA is the minimum increase in sound level that is generally perceptible to the human ear. The department Policy 90-001 (Jan. 16, 1990) limits noise increases at property lines and nearest residences to ten dBA above background levels.[8] The town of Dracut noise bylaw limits continuously generated sound at adjacent residences or institutional uses to fifty dBA at night and sixty dBA during the day. The proposed generating facility would operate within these limits as to residences.[9]

The record indicates that the cost of reducing the noise impacts from six to three dBA would be in excess of $14 million, and over $28 million to reduce the noise from six to zero dBA. The board concluded that limiting noise increases from the proposed generating facility beyond the measures proposed by Nickel Hill "would not provide sufficient benefit to warrant the significant additional cost," and that noise from "operation of the proposed facility as designed would be minimized, consistent with minimizing cost of mitigation."

The interveners further challenge Nickel Hill's proposed

. [8]The department's air quality plan approval process serves as the State's method for noise impact review. See 310 Code Mass. Regs. §§ 7.00, 7.10; Policy 90-001 (Jan. 16, 1990).

[9]A waiver of Policy 90-001 will be required for the ten-decibel property line limit with respect to an adjacent nonresidential receptor, but this does not affect any of the residential receptors.

sound mitigation measures as lacking in final design specifications. As with air emissions, it makes little sense to require a developer to finalize the details of sound mitigation measures until it learns what additional measures the department might require. If it requires any substantial changes to Nickel Hill's mitigation measures, Nickel Hill must return to the board to request an amendment, or risk revocation of the board's approval.

The findings of the board concerning noise impacts are supported by substantial evidence, and they are entitled to due deference. See *Massachusetts Mun. Wholesale Elec. Co.* v. *Energy Facilities Siting Council*, 411 Mass. at 199. The interveners have failed to show that these findings are invalid.

(d) *Traffic safety issues.* The interveners argue that the board's finding that Nickel Hill had minimized safety risks was unsupported by substantial evidence, in two respects. They first challenge the credibility of Nickel Hill's traffic expert. Credibility determinations are a matter for the board that will not be set aside unless shown to be arbitrary or unsupported by substantial evidence. See *Zachs* v. *Department of Pub. Utils.*, 406 Mass. 217, 224-225 (1989). There has been no showing that the board's acceptance of the testimony was invalid. Based on the witness's testimony and the documentary traffic analysis presented by Nickel Hill, the board found that operation of the proposed generating facility "would create minimal additional traffic." Moreover, the board noted that Dracut found that the proposed relocation of the industrial park access road would likely improve traffic safety. The board's finding was supported by substantial evidence.

The second issue involves the transportation of liquid ammonia in tankers to the proposed generating facility. The board limited deliveries to the hours between 3 A.M. and 6 A.M., when traffic is light. Concluding that the probability of a spill is small, based on Nickel Hill's model of a hypothetical spill, the board required Nickel Hill to develop an emergency response plan in conjunction with Dracut and Methuen to cover such a contingency. The interveners have failed to show that these measures do not minimize environmental impacts or that the board's findings were not supported by substantial evidence.

(e) *Future decisions by the department.* The interveners revisit an earlier claim that the board improperly delegated and abdicated its responsibilities under § 69J¼ to the department, and they now claim certain findings of the board were not supported by substantial evidence. The argument is based on the same misconception about the different roles of the board and the department, and about what the board found.

The interveners again rely on *Point of Pines Beach Ass'n* v. *Energy Facilities Siting Bd.*, 419 Mass. 281, 285 (1995), for the proposition that an agency must make the required ultimate findings and may not abdicate its responsibility to other agencies. The board made all the necessary ultimate findings, and its ultimate findings were supported by substantial evidence.

The board's determination that it would not require $SCONO_x$ technology was based on its analysis that $SCONO_x$ technology would not minimize environmental impacts consistent with the minimization of costs associated with mitigation. That determination was properly within the board's jurisdiction. See G. L. c. 164, § 69J¼, fifth par. The board went on to note that the department might nevertheless require the use of $SCONO_x$ technology as the BACT or LAER technology for a particular pollutant, in which case Nickel Hill would have to return to seek an amendment to its permit. The decision to require $SCONO_x$ technology as BACT or LAER for a pollutant is a decision for the department, as regulator of air emissions,[10] not for the board, whose role in this regard is limited to determining accuracy and completeness of descriptions, and whether impacts have been minimized consistent with the minimization of costs associated with mitigation.

The board must consult the department's decisions about BACT or LAER, when, under its rulemaking authority, it establishes a technology performance standard (TPS) for a given year. TPS, in turn, can be used only "to determine whether a petition . . . shall include information regarding other fossil fuel generation technologies," a requirement that has no application here. See G. L. c. 164, § 69J¼, second par. Outside

---

[10]See 310 Code Mass. Regs. § 7.02 (2) (a) (2) (g) (1994); 310 Code Mass. Regs. §§ 7.00 Appendices A and B. See also 42 U.S.C. §§ 7479(3), 7501(3) (1994).

the context of establishing TPS and determining the minimization of impacts and costs, the board has no involvement with BACT and LAER issues, much less determining what technologies may be permitted.

The board did not delegate its responsibility, nor did it fail to make any required factual finding. Its findings in this area were supported by substantial evidence.

4. *Site selection process.* The interveners argue that the board's review of Nickel Hill's site selection process was improperly limited to whether the description of the process was accurate. They contend that the board had the further obligation to conduct what they describe as a "substantive investigation into the site selection process," including a "determin[ation] that the selection process itself contributes to a reliable power source for the Commonwealth with minimum environmental impacts consistent with the minimization of cost." The interveners cite no authority in support of their position. The board's duties with respect to site selection review are limited to a determination whether "the description of the site selection process used is accurate." G. L. c. 164, § 69J¼, fifth par. It is not argued that Nickel Hill's description of that process was not accurate.

There is no merit to the interveners' further claim that the board improperly precluded inquiry into advantages and disadvantages of the proposed site over other available sites. Section 69J¼, fifth par., expressly states that "[n]othing in this chapter shall be construed as requiring the board to make findings regarding the need for, the cost of, or alternative sites for a generating facility."

5. *Procedural errors.* The interveners, but chiefly Merrimack Valley Residents for the Environment, Inc. (MVRE), argue in cursory fashion that the board precluded cross-examination or discovery into eight areas of testimony, in violation of 980 Code Mass. Regs. § 1.04(4)(a) (1993).[11]

(a) The restriction of cross-examination into matters of cost

---

[11]Title 980 Code Mass. Regs. § 1.04(4)(a) (1993) states: "All parties shall have the right to introduce both oral and documentary evidence. All witnesses shall testify under oath . . . and shall be subject to cross-examination."

in the site selection process was not improper, as the subject is irrelevant. See G. L. c. 164, § 69J$^1$/$_4$, fifth par.

(b) MVRE received those portions of Nickel Hill's term sheet governing its lease of the site pertaining to environmental impacts. Other portions, particularly those relating to cost, were not relevant to the proceedings and therefore were not discoverable. See G. L. c. 164, § 69H ("the board shall review only the environmental impacts of generating facilities"), § 69J$^1$/$_4$.

(c) MVRE's cross-examination of an expert witness retained by Nickel Hill concerning conversations with Nickel Hill's attorney was excluded on the basis of the attorney-client privilege. The discussion does not rise to the level of adequate appellate argument, and we do not consider it. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

(d) Cross-examination into the comparative cost of air emissions and noise mitigation measures, and the cost of the project, was excluded. We are unable to address the issue because the interveners have provided no record reference.

(e) MVRE argues that the hearing officer improperly struck or limited most of its direct case, and improperly refused its request to introduce rebuttal testimony. The portions struck included a lengthy legal argument by counsel, together with supporting materials. The material was not evidence and was properly struck. Other exhibits were properly struck after MVRE failed to designate an expert witness whose testimony was needed to give foundation for and to explain the exhibits.

MVRE's request for an opportunity to present rebuttal testimony was not rejected, but was in fact honored, and MVRE was given five weeks to submit the testimony. When MVRE offered the testimony, after the deadline, the hearing officer excluded the evidence, not on ground that it was not timely, but because it was irrelevant and not proper rebuttal evidence. MVRE has offered no authority suggesting that the ruling was invalid.

(f) The hearing officer acted within her discretion by refusing to extend discovery after MVRE failed to act within the time allowed. We need not consider MVRE's naked assertion, unsupported by any authority or reasoned argument, that the hearing officer denied portions of its motion to compel discovery.

Town of Andover *v.* Energy Facilities Siting Board.

(g) The hearing officer did not, as the interveners argue, preclude all inquiry into BACT and LAER issues. The hearing officer explained that she would not consider testimony as to whether $SCONO_x$ was BACT for the proposed generating facility, as that was not an issue within the jurisdiction of the board, but a question to be decided by the department, for reasons previously discussed. The ruling was correct.

(h) The hearing officer properly sustained an objection to continued cross-examination of a Nickel Hill expert witness on which portions of a document had been written by which authors, after the witness testified he could not say. The question was answered and its impeachment value established as to that point. Pressing the matter had little or no value, other than to harass the witness and waste time. Counsel was not precluded from using the document to impeach the witness for other purposes, as the witness had adopted the entire document as a comprehensive statement of his own views.

There was no violation of the interveners' procedural rights under 980 Code Mass. Regs. § 1.04(4)(a).

6. *Nickel Hill's standing.* There is no merit to the argument that Nickel Hill lacks standing to petition for a permit to construct the proposed generating facility at the selected site because it had not secured an ownership, leasehold, or other interest in the site. The statute does not require such an interest.

The decision of the board is affirmed.

*So ordered.*