NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-1375

ADOPTION OF OSEI.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The father appeals from a decree issued by a Juvenile Court judge finding him unfit to parent his son, terminating his parental rights, and approving the adoption plan of the Department of Children and Families (department). Concluding that the judge properly found clear and convincing evidence of parental unfitness that would continue indefinitely, we affirm.

Background. We set forth the facts found by the judge, reserving some details for later discussion. The father and the mother share two children; Osei, born in July 2022, who is the subject of this appeal, and Carly,[2] Osei's sister, who was born in December 2017. We address the father's involvement with the

_____

[1] A pseudonym.

[2] A pseudonym.

department prior to Osei's birth as it bears on the judge's findings and conclusions. In 2019, the department received three reports pursuant to G. L. c. 119, § 51A (51A reports), alleging neglect of Carly: the first when the mother was arrested for assault and battery on the father, who had scratches, redness, and bruising; the second alleging that the mother, the father, and the maternal grandmother were using substances in the home; and the third, which led to a case for services being opened, when the father was arrested after headbutting the maternal grandmother, causing her to bleed from her mouth. Throughout the three investigations, the mother and the father denied any domestic violence or substance use, declined services for Carly, refused to enroll in their own therapeutic services, and inconsistently met with the department.

In August of 2020, the father was arrested for assault and battery on a household member when, with Carly present, he slapped and put his hands around the mother's neck and threw her to the ground. He also attacked the maternal grandmother. The parents again denied any domestic violence existed in their relationship and refused all services. During the time that the case was open, it was discovered that between January of 2020 and January of 2021, the family had canceled or failed to appear

2

for multiple pediatric appointments and a well visit for Carly, and that she was behind in lead testing and other inoculations.

In August of 2021, police officers were dispatched to the father's home upon a report of a "female banging on her neighbor's door, screaming for help." With Carly present, the father had hit and strangled the mother, thrown a dresser drawer at her, held her down, taken her phone, and stepped on her throat and vaginal area. During the investigation, the mother had bruises on her legs, arms and neck that she confirmed were from the attack by the father. On August 24, 2021, the department assumed emergency custody of Carly. Specifically, the department supported the allegations of neglect due to domestic violence and had concerns with the mother's untreated mental health and substance use, and the father's substance use. Throughout the investigations, the department remained concerned about the parents' dishonesty with the department and their failure to engage in services.

For five months following Carly's removal, the mother and the father consumed fentanyl daily. They also used cocaine and marijuana. The father purchased the substances from a drug dealer and provided them to the mother. The father did not have consistent communication with the department or attend visits with Carly.

3

Around January 20, 2022, the father discovered that the mother was pregnant but continued to purchase her narcotics and use them with her. The father entered a detoxification and rehabilitation program (program) on January 28, 2022, and admitted that he had an opiate dependence for several years, only achieving sobriety when incarcerated. The father left the program after approximately eleven days of treatment.

In the months after attending the program, the father resided with the mother who continued to use narcotics during her pregnancy. The father met with the department in March of 2022 and disclosed his participation in the program but did not inform the department of the mother's pregnancy or that she continued to use narcotics.

Osei was born a few months later. Two days following Osei's birth, the department received a 51A report alleging neglect and substance exposure concerns because of the mother's cocaine and fentanyl use during her pregnancy, her lack of prenatal care, and because Osei tested positive for methadone at birth. The department conducted an emergency removal of Osei and opened the case for investigation. During the investigation the father was "not forthcoming" about his history of substance use, claimed he had not used substances for six months despite his relapse in March of 2022, continued to deny any domestic

4

violence between himself and the mother, and did not sign a release for the department to access his provider's treatment records before the conclusion of the investigation.

In August of 2022, during a stop for operating a motor vehicle with a suspended license, the police found drug paraphernalia, burnt Brillo, and glass pipes in the father's vehicle. In May of 2023, police officers were called to the parents' home for a domestic disturbance. The parents both told the officers that it was a verbal argument even though the father had visible injuries. In August of 2023, the mother sent four text messages to a group that included a department social worker and the father, seeking the father's assistance in procuring "fake" urine for her to tamper with her unsupervised drug screens.

The department recommended action plan tasks to the father including attending meetings with the department, attending visits consistently, signing unrestricted releases relative to his drug screens, and enrolling in outpatient treatment, plus engaging in individual counseling, a parenting class, a nurturing father's class, an anger management program, and inmate partner violence services. The father did not attend any anger management sessions until almost a year following Osei's removal and attended only a four-hour domestic violence class

5

despite the department recommending intensive treatment.  The

father relapsed in March and October of 2022 after using

cocaine, and he tested positive for tetrahydrocannabinol (THC)

over several months.  The father failed to attend visits with

Osei from October of 2022 until January of 2023 and failed to

attend eight visits between January 27 and May 16 of 2023.

Trial began in October of 2023 when Osei was fifteen months

old, and proceeded over five nonconsecutive days, concluding on

January 31, 2024.  Days before trial began, a police officer

attempted to pull over the father's vehicle for a revoked

registration.  The father "intentionally fled" and accelerated

through a school zone, "dr[iving] recklessly endangering

numerous children" before "crash[ing]. . . in the front of the

. . . Police Station."[3]  The father's actions "put numerous

children at risk."

At trial the father took the position that he and the

mother were no longer in a relationship and argued that Osei

should be returned to his custody.  The father argued that he

had complied with his action plan tasks, that he was sober, that

no domestic violence had infected the parents' relationship, and

that he had no concerns about the mother's substance use.

---

[3] At trial the father testified that he crashed because his
power steering failed.  The judge did not credit this testimony.

Discussion. 1. Standard of review. To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of the evidence, that the parent is unfit to care for the child and that termination is in the children's best interests. Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). That decision must also be supported by a finding "that the current parental unfitness is not a temporary condition." Adoption of Virgil, 93 Mass. App. Ct. 298, 301 (2018). "We review the judge's findings with substantial deference, recognizing her discretion to evaluate a witness's credibility and to weigh the evidence." Adoption of Nancy, 443 Mass. 512, 515 (2005). Where there is clear and convincing evidence that the parent is unfit and likely to remain so, we give substantial deference to the trial judge's decision regarding the child's best interests and "reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011).

Here, the record amply supports the judge's 237 findings of fact and multiple conclusions of law, and we discern no abuse of discretion or error of law in the ultimate conclusions that the

7

father is unfit, that his unfitness is not temporary, and that termination of his parental rights is in Osei's best interests.

2. The father's briefing. At the outset, we address the father's briefing. The father asserts that the "majority" of the judge's findings do not pertain to him and are relevant only to the mother or the child. He then references dozens of findings without supporting legal argument. We see no need to address these claims as this briefing does not rise to the level of appellate argument. See Mass. R. A. P. 16 (a) (9) (A), as appearing in 481 Mass. 1628 (2019). Also, the father argues error within the judge's "summary" without making specific references to the record. Arguments relying on "naked assertion[s], unsupported by any authority or reasoned argument," Andover v. Energy Facilities Siting Bd., 435 Mass. 377, 394 (2001), do not rise to the level of appellate argument and are deemed waived. See Kellogg v. Board of Registration in Med., 461 Mass. 1001, 1003 (2011); Geezil v. White Cliffs Condominium Four Ass'n, 105 Mass. App. Ct. 103, 112 n.8 (2024); Adoption of Zak, 90 Mass. App. Ct. 840, 842 n.4 (2017). Notwithstanding, we exercise our discretion and address the discernible issues.

3. Parental unfitness. When reduced to essentials, the father challenges the judge's finding of unfitness, and the

8

subsidiary findings related to his substance use, the impact of violence in the household, and the father's inability to terminate his relationship with the mother.  We address each in turn.

a.  Substance use.  The father argues that the judge's findings nos. 91, 105, and 134, and the conclusions of law on pages 43, 46, 48 and 49 -- all related to the father's substance use -- are clearly erroneous.  We disagree.  Finding no. 91 accurately reports that the father "stepped down" from the program and failed to initiate a relapse prevention plan, as supported by a July 2022 affidavit of a department social worker and a November 2022 status report.  Finding no. 105 is supported by the father's own admission to the department that he relapsed in March of 2022 and did not enter outpatient treatment until October of 2022, and finding no. 134 is a verbatim transcription of four text messages sent by the mother to the department social worker and the father seeking to purchase fake urine for her drug testing.

To the extent that the father challenges the judge's findings within her conclusions of law that the father aided the mother in the manipulation of her drug screens and that the father failed to protect the child from the mother's substance abuse in utero, the judge was within her discretion to decline

9

to credit the mother's explanation that the text messages seeking assistance in tampering with her drug screen were "an error on [her] part," and the judge could fairly infer that the father was not only aware of the mother's attempts to manipulate her screens but had financed her purchase and used fake urine himself in the completion of his unsupervised drug screens. "Evidence of alcohol or drug abuse clearly is relevant to a parent's willingness, competence, and availability to provide care . . . ." Care & Protection of Frank, 409 Mass. 492, 494 (1991). Moreover, there was ample evidence that at a time when the father knew the mother was pregnant, he purchased fentanyl and cocaine and used it with her. Even though the father later equivocated and testified that he "didn't know if it was during pregnancy or not," the mother testified that she and the father used fentanyl, purchased by the father, daily until her admission to her rehabilitation program. These credibility determinations were within the judge's discretion, and the judge could reasonably infer that the father, aware of the mother's pregnancy, failed to report either the pregnancy or the substance misuse to the department.

b. Domestic violence and the father's relationship with the mother. The father also challenges the judge's conclusions that "Father's relationship with Mother, who continues to abuse

10

substances, the domestic violence between them, and poor decision-making inhibits Father from assuming parental responsibility," and "[b]ecause Mother and Father remain a united couple, Mother's untreated issues, unacknowledged by Father, affect Father's ability to parent [Osei] and to keep [Osei] safe from Mother." These conclusions reflect the judge's concern that the father denied his ongoing relationship with the mother, refused to acknowledge both during the open care and protection case and at trial the history of domestic violence and substance misuse, and had no insight into the ongoing risks to his son from these things.

That the father continued to be in a relationship with the mother was amply supported by the mother's admissions, credited by the judge, to sleeping overnight at the father's home; her belongings remaining at the home, including her pet cat; failing to provide the department with the name or address of any new roommate or residence; and depending on the father for financial and transportation support. Moreover, the findings that the parties' relationship was marred by domestic violence were well-substantiated by reports including the mother's arrest for domestic assault and battery of the father, the father's arrest for "head-butt[ing]" the maternal grandmother in the presence of

11

the mother and Carly, and a police intervention where the mother reported, inter alia, that the father had hit and strangled her.

On this record, the judge was within her discretion to conclude that the father neither admitted to being a victim or perpetrator of domestic violence, nor meaningfully benefitted from the programs that he attended, "evidenced by his continued denials, minimization of prior incidences, and refusal to engage in concentrated services." "[M]ere participation in the services [recommended by the department] does not render a parent fit 'without evidence of appreciable improvement in [their] ability to meet the needs of the child[].'" Adoption of Ulrich, 94 Mass. App. Ct. 668, 677 (2019), quoting Adoption of Terrence, 57 Mass. App. Ct. 832, 835-836 (2003). The judge properly inferred that the child remained at risk of exposure to serious substance misuse and violence while in the father's care. "[I]nstances of such familial violence are compelling evidence of a finding of parental unfitness." Adoption of Talik, 92 Mass. App. Ct. 367, 374 (2017). "Violence within a family is highly relevant to a judge's determination of parental unfitness and the best interests of the children." Adoption of Gillian, 63 Mass. App. Ct. 398, 404 n.6 (2005). "[P]hysical force within the family is both intolerable and too readily tolerated, and . . . a child who has been either the victim or

12

the spectator of such abuse suffers a distinctly grievous kind of harm" (citation omitted). Adoption of Garret, 92 Mass. App. Ct. 664, 671 (2018).

4. Termination of parental rights. The father argues that even if he was unfit at the time of the trial, the judge erred by finding that it was not temporary and instead would continue into the future. A "judge is not required to grant [a parent] an indefinite opportunity for reform," Adoption of Cadence, 81 Mass. App. Ct. 162, 169 (2012), and "[w]hile consideration of the reasonable likelihood that a parent's unfitness at the time of trial may only be temporary is appropriate, such a prediction must rely 'upon credible evidence rather than mere hypothesis or faint hope.'" Adoption of Lisette, 93 Mass. App. Ct. 284, 296 (2018), quoting Adoption of Serge, 52 Mass. App. Ct. 1, 7 (2001). As discussed above, we conclude that given the judge's findings, amply supported by the record, that the father neither acknowledged or addressed a lengthy history of violence in his relationship with the mother nor acknowledged his lengthy history of substance use and relapse, the judge committed no error or abuse of discretion. While the father may have availed himself of some programs and achieved some improvements, the judge properly concluded that the father's participation was insufficient to mitigate the potential for risk of harm to Osei.

See Adoption of Ilona, 459 Mass. at 59-60 ("Even where a parent has participated in programs and services and demonstrated some improvement, we rely on the trial judge to weigh the evidence in order to determine whether there is a sufficient likelihood that the parent's unfitness is temporary").[4]

Decree affirmed.

By the Court (Massing, Sacks & Allen, JJ.[5]),

Clerk

Entered: February 27, 2026.

---

[4] "Other points, relied on by the [father] but not discussed in this opinion, have not been overlooked. We find nothing in them that requires discussion." Commonwealth v. Domanski, 332 Mass. 66, 78 (1954). Those include that the father's criminal record had insignificant prognostic value and that Osei was not bonded with his preadoptive family.

[5] The panelists are listed in order of seniority.

14