SUPREME JUDICIAL COURT 
 
 JACQUELINE JOHNSON vs. ENERGY FACILITIES SITING BOARD & another[1]

 
 Docket:
 SJC-13622
 
 
 Dates:
 November 6, 2024 - January 9, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, & Wolohojian, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Energy Facilities Siting Board. Environment, Noise. Public Utilities, Energy company, Electric company. Electric Company. Administrative Law, Substantial evidence, Decision, Judicial review.
 
 

       Civil action commenced in the Supreme
Judicial Court for the county of Suffolk on December 20, 2023.
      The case was reported by Gaziano, J.
      Christopher G. Senie for the petitioner.
      Thaddeus Heuer (Aaron Lang also present)
for the intervener.
      John R. Hitt, Assistant Attorney General
(Katherine M. Fahey, Assistant Attorney General, also present) for the
respondent.
      David S. Rosenzweig, Erika J. Hafner,
& Michael J. Koehler, for NSTAR Electric Company, amicus curiae, submitted
a brief.
      WENDLANDT, J.  "And no one dared / Disturb the sound of
silence."[2]  Comprised of multiple
cacophonous industrial components, including two particularly loud step-up
transformers, the substation[3] at the center of the present dispute, which
will connect an offshore wind farm to the New England electric grid,
indubitably will not be silent.  But the
substation's potential clangor will be dampened by implementing design
features, according to acoustical experts' reports and testimony presented by
the project's proponent, Park City Wind LLC (PCW), to the Energy Facilities
Siting Board (board).  These features,
the experts opined, will lessen the substation's contribution to the ambient
sound level at the abutting home of the petitioner, Jacqueline Johnson;[4] more
specifically, the experts told the board, the substation, designed with these
proposed softening features, will affect the sound levels at Johnson's home by,
at the most, eight A-weighted decibels (dBA),[5] a benchmark that is well
within the allowable noise impact of ten dBA set by the Department of
Environmental Protection (DEP).[6]
      To arrive at the noise estimate, the
experts relied on industry-standard sound-modeling software to optimize the variables
that will contribute to the expected noise levels.  Among the variables the experts tweaked were
certain sound level design specifications for the yet-to-be-manufactured
substation equipment, which will require PCW to procure equipment with features
to meet the needed "quieted" levels of sound emissions.  Acknowledging that the specifications were
"aggressive," the experts nonetheless anticipated them to be within
the equipment manufacturers' ken.
      Following a three-year administrative
process, during which Johnson was allowed to participate fully, to demand
discovery from PCW, to submit briefing materials setting forth her position,
and to cross-examine PCW's experts, the board approved PCW's petition to
construct the substation, subject to several conditions.[7]  See G. L. c. 164, § 69J.  Because the experts' modeling relied, in
part, on sound level specifications of yet-to-be-manufactured equipment, and
because Johnson had raised concerns regarding manufacturers' abilities to meet
these design specifications, the board required PCW to confirm, prior to
construction, that the predicted eight dBA ambient sound level increase at
Johnson's home would not be exceeded once the actual sound level specifications
of the substation equipment are known;[8] this preconstruction compliance
filing must set forth any additional noise mitigation measures that PCW intends
to take.  The board further required
that, after the construction, PCW confirm that the as-built operational
substation does not exceed the eight dBA sound level increase at Johnson's
home.  At each of these stages, the board
directed PCW to cooperate with Johnson and to attempt to reach consensus on any
proposed noise mitigation efforts.  If
these preconstruction or postconstruction reviews show that PCW will be unable
to ensure that the substation's contribution to ambient noise levels at
Johnson's home will be capped at eight dBA, PCW will need to submit a project
change petition in order to proceed with the proposed construction and
operation of the substation, reopening proceedings and providing Johnson a
renewed opportunity to participate in the approval process. 
      On appeal, Johnson contends that the
board's decision, insofar as it rests on the substation's anticipated noise
impact, is not supported by substantial evidence because the predicted rise in
ambient sound levels rests, in part, on aggressive sound level design
specifications for yet-to-be-manufactured substation equipment.  Concluding that Johnson failed to surmount
the heavy burden required to overturn the board's decision, to which we owe
great deference, and further concluding that the preconstruction and
postconstruction reviews are not improper, we affirm.[9]
      1. 
Discussion.[10]  In conducting our
review of the board's decision,[11] "we give great deference to the
board's expertise and experience." 
Alliance to Protect Nantucket Sound, Inc. v. Energy Facilities Siting
Bd., 448 Mass. 45, 51 (2006) (Alliance I). 
We do not "substitute our judgment or the petitioners' judgment for
that of the board."  Sudbury v.
Energy Facilities Siting Bd., 487 Mass. 737, 738 (2021).  A party challenging the board's decision
"bears the burden of proving that the decision is invalid, and that burden
is a heavy one."  Alliance I, supra,
citing G. L. c. 25, § 5.
      a. 
Substantial evidence.  Johnson
first contends that the part of the board's decision concerning the noise
impact of the substation[12] is not supported by substantial evidence.  See G. L. c. 164, § 69P.  "'Substantial evidence' means such
evidence as a reasonable mind might accept as adequate to support a
conclusion."  G. L.
c. 30A, § 1 (6).  See
Andover v. Energy Facilities Siting Bd., 435 Mass. 377, 386 (2001).  When reviewing the board's decisions, we do
not determine "whether, faced with the same set of facts, we would have
drawn the same conclusion as [the board], but only 'whether a contrary
conclusion is not merely a possible but a necessary inference.'"  Alliance to Protect Nantucket Sound, Inc. v.
Energy Facilities Siting Bd., 457 Mass. 663, 690 (2010) (Alliance II), quoting
Goldberg v. Board of Health of Granby, 444 Mass. 627, 638 (2005).  
      Here, the board was presented with reports
and testimony of PCW's experts,[13] who performed an acoustical analysis of the
proposed substation's sound level impacts at thirteen locations -- including at
Johnson's home.  The experts explained to
the board that their analysis was conservative, assuming a worst-case scenario
vis-à-vis noise impact from the substation. 

      For example, the analysis was based on a
sound survey conducted in January to establish baseline ambient noise levels
near the proposed substation site.  The
experts explained that the choice of midwinter leafless conditions maximized
the predicted sound level impact of the substation.  The analysis also assumed meteorological
conditions that provided the least amount of natural sound level dampening, and
that the ground throughout the substation site comprised hard reflective surfaces
rather than the planned crushed stone, thereby increasing the modeled sound
levels.  Moreover, the sound analysis
focused on conditions between 12 A.M. and 4 A.M. when traffic from
Route 6 would be reduced and the effect of the substation noise levels would be
greatest.[14]  
      The engineers also assumed that all
substation equipment would be operating at full capacity, a scenario that
maximized the substation's impact on ambient sound levels.  Such a scenario, according to the record,
would be atypical; the highest possible project sound levels -- which included
cooling equipment running at maximum capacity -- would likely not occur
simultaneously with the lowest midwinter ambient sound levels.[15]
      Based on these assumptions and using
industry-standard modeling software, the experts optimized the substation
design guided by the requirement that sound level increases at nearby
residences, such as Johnson's home, must fall below the DEP noise policy level
of ten dBA.[16]  Iteratively adjusting
sound-contributing and sound-mitigating variables, they proposed a substation
design that resulted in ambient sound level increases of no more than eight dBA
at Johnson's home, even under the worst case conditions.[17]
      For example, the experts determined the
optimal layout for the various substation equipment to reduce noise level along
the site's western boundary, which abuts Johnson's property.  They adjusted the dimensions of a proposed
sound-absorbing three-sided barrier enclosing the two static synchronous
compensators (STATCOMs) closest to Johnson's home, arriving at a configuration
that is 400 feet long and thirty-five feet high along its western side, which
the software showed will help to deflect sound away from Johnson's
residence.  They also adjusted the
materials to be used for the sound barrier to improve its dampening
effects.  They housed the gas-insulated
switchgear (GIS) in a switchgear building that will act as a sound barrier for
the noise levels emitted by the GIS, planned to be located near the center of
the substation site.  They included a
ninety-foot long and ten-foot high sound wall at the southern end of the
substation site[18] identified by earlier modeling.[19]
      Relevant to Johnson's present challenge,
PCW's experts also set design specifications for the sound levels of
yet-to-be-manufactured substation equipment, requiring PCW to procure equipment
with features designed to meet the "quieted" levels of sound
emissions.[20]  The experts used, as a
starting point for the sound analysis of the substation's transformers, data
from the Edison Electric Institute Noise Guide, which was last updated in 1984.[21]  Then, informed by conversations with
equipment manufacturers during the experts' involvement in the procurement
process for Vineyard Wind I, a previously approved substation to connect the
wind farm to another site in Barnstable,[22] as well as their own expertise in
mechanisms for sound dampening, the experts set "aggressive" sound
level specifications for the substation equipment, which will require PCW to
procure equipment that meets specifications that emit less sound than similar
equipment to be used in the Vineyard Wind I project.[23]   PCW's experts explained that features, such
as denser casings around the transformers[24] and the use of larger but slower
fans for the STATCOMs' cooling fan banks, could be implemented by manufacturers
to help achieve the specified lower sound levels.  
      On appeal, Johnson asserts that the
engineers applied unsubstantiated reductions to the sound levels of already
quieted modeled equipment.  She notes
that the specifications for the modeled equipment -- which have not yet been
confirmed by any manufacturer -- are lower than those for the acoustical model
presented in Vineyard Wind I.  Yet,
Johnson presented no evidence to the board that the sound specifications could
not be met.  See Duggan v. Board of
Registration in Nursing, 456 Mass. 666, 675 (2010) (petitioner's unsupported
denial failed to meet burden to show "'overwhelming probability' against
the [agency's] credibility determinations and ultimate conclusions").  
      More importantly, Johnson ignores that
PCW's experts opined that the specifications were commercially feasible.  Specifically questioned whether the quieted
levels were "speculative," one expert averred that 
"[t]he
sound-level data we have for each piece of equipment is based
on . . . the real world. 
It's based on real pieces of equipment used in other projects of a
similar order of magnitude.  So it's
not . . . fictitious or anything like that.  It's based on typical, appropriately sized
and commercially available equipment that we would expect to be similar in
nature here for this particular project." 
The expert
concluded:  "At this juncture, the
company is confident that the modeled levels can be met."[25]
      Despite lingering questions as to the
quieted equipment specifications,[26] the board approved PCW's proposal for the
substation, stating that PCW has an "absolute obligation to construct and
operate its facility in conformance with all aspects of its proposal as
presented to the [board]," including that the ambient sound level increase
at Johnson's residence will not exceed eight dBA.  The board was entitled to rely on the
experts' opinions to require PCW to abide by its proposed ambient sound level
increase.  See Brockton v. Energy
Facilities Siting Bd. (No. 1), 469 Mass. 196, 213 (2014) (board has "broad
discretion to weigh and assess the credibility of evidence" supporting its
final decision); Police Dep't of Boston v. Kavaleski, 463 Mass. 680, 694 (2012)
(agency, not court, is "sole judge of the credibility and weight of the
evidence before it").
      Rather than grant what the board described
as the "drastic" remedy sought by Johnson -- namely, rejection of the
project on the Barnstable site -‑ the board determined to monitor the sound
levels of the various substation components once they are procured.  Specifically, it included a condition,
"Condition S," requiring PCW to demonstrate preconstruction and
postconstruction compliance with the modeled noise impacts.  Eschewing a singular focus on the noise
levels that will be emitted by each individual component comprising the
substation, the condition evidences the board's recognition that the increase
in ambient sound levels from the substation is a multi-variable problem that
depends on, inter alia, the equipment noise levels as well as noise mitigation
elements.  The preconstruction and
postconstruction reviews allow PCW the flexibility to modify these sound variables
-- with Johnson's consensus[27] -- to limit the sound level increase at
Johnson's home to eight dBA. 
Accordingly, Johnson has not shown that the board's decision is not
supported by substantial evidence.     
      b. 
Propriety of the board's conditional decision.  Johnson next contends that Condition S,
requiring preconstruction and postconstruction compliance filings, is unlawful
insofar as it delegates a decision on the noise impact of the proposed
substation to a future board.  But, as
Johnson acknowledges, G. L. c. 164, § 69J, expressly authorizes
the board to "approve the petition subject to stated conditions," an
authority the board has often exercised. 
See, e.g., GreenRoots, Inc. v. Energy Facilities Siting Bd., 490 Mass.
747, 749 (2022) (noting board's final decision subject to condition that
company "enter into discussions with the City of Boston" to relocate
facility site); Box Pond Ass'n v. Energy Facilities Siting Bd., 435 Mass. 408,
410-411 (2001) (describing board's final decision subject to specific
conditions).
      Indeed, we previously have concluded that
a condition is particularly apt where, as here, pertinent information is not
readily available and the board cannot act with "absolute
finality."  Alliance I, 448 Mass. at
53-54.  See Andover, 435 Mass. at 384-388
(affirming conditions requiring project to meet estimated air emissions and
imposing periodic monitoring of noise levels). 
In such circumstances, issuing a condition to demonstrate compliance
with the applicant's proposal does not reserve a decision but rather requires
the applicant to show compliance with its proposal once the relevant
information becomes available.[28]  See
Alliance I, supra at 54.  The board's
final decision, together with the noise condition discussed supra, fall
comfortably within its statutory authority. 
See G. L. c. 164, § 69J.
      2. 
Conclusion.  We affirm the
decision of the board.
So ordered.

footnotes

[1] Park City
Wind LLC, intervener.   
[2] Simon &
Garfunkel, The Sound of Silence, on Wednesday Morning, 3 A.M. (Columbia Records
1964).

[3] The
substation will connect an approximately 800-megawatt wind turbine generation
facility in Federal waters south of Martha's Vineyard (wind farm) to the New
England electric grid by converting the wind farm's electrical output from 275
kilovolts (kV) to 345 kV for transmission to an existing substation known as
the West Barnstable substation.  Park
City Wind LLC's (PCW's) proposed substation is to be located in Barnstable on
an approximately 6.7-acre parcel southwest of the intersection of Routes 6 and
132. 

[4] The experts
estimated sound levels outdoors at Johnson's residence, which is 144 feet from
where the substation's nearest noise-producing machinery will be located.  For purposes of this opinion, we use
"home" and "residence" interchangeably in reference to this
outdoor point of sound level estimation.

[5] According to
PCW's experts, the A-weighted decibel (dBA) metric "is the accepted scale
used [by engineers] for community sound level measurements" because it
"most closely approximates how the human ear responds to sound at various
frequencies."

[6] See note 16,
infra.

[7] After the
submission of Johnson's opening brief, in which Johnson noted that the board's
preconstruction and postconstruction reviews, discussed infra, appeared not to
include all the equipment contributing to the sound level effects of the
substation, the board corrected its decision to clarify that the board intended
that the preconstruction and postconstruction reviews apply to all the
substation equipment.  Johnson does not
object to the board's correction. 
Accordingly, we review the board's final decision, as corrected.

[8] The board
mandated that PCW must meet "all aspects of its proposal as presented to
the [board]," including the eight dBA maximum approved sound level
increase at Johnson's residence.  At oral
argument, the board and PCW acknowledged that the board's approval required
PCW, inter alia, to construct the substation so as not to exceed an eight dBA
increase in ambient sound levels at Johnson's home.

[9] We
acknowledge the amicus brief submitted by NSTAR Electric Company, doing
business as Eversource Energy.

[10] As the
statutory framework for the board's approval, G. L. c. 164,
§§ 69H–69O, was reviewed recently in Conservation Law Found. v. Energy
Facilities Siting Bd., 494 Mass. 594, 596-597 (2024), and Sudbury v. Energy
Facilities Siting Bd., 487 Mass. 737, 739-740 (2021), we proceed directly to
the merits of Johnson's arguments on appeal.

[11] Johnson
sought judicial review of the board's final decision from a single justice of
this court, pursuant to G. L. c. 25, § 5, and G. L.
c. 164, § 69P.  The parties
jointly moved that the matter be reserved and reported to the full court, and
the single justice allowed the motion.  

[12] Johnson
limits her challenge to the issue of the noise impact from the proposed
substation.  Accordingly, we do not
address any other aspects of the board's decision or the procedural aspects of
its proceedings.

[13] Johnson
marshals no challenge to the qualifications of PCW's experts.

[14] PCW's
experts explained that during the day and evening hours, the noise from the
substation would be dwarfed by the preexisting ambient sound levels from
traffic along Route 6.

[15] PCW's
experts added two dBA of "modeling uncertainty" to the sound level
results predicted by the model, which the experts explained was a "good
amount of margin." 

[16] DEP
regulates noise pursuant to 310 Code Mass. Regs. § 7.10 (2024).  Relevant to the present matter, DEP's noise
policy generally sets ten dBA as the maximum allowable increase in ambient
sound levels.  Executive Office of
Environmental Affairs, Division of Air Quality Control Policy 90-001 (Feb. 1,
1990) (Policy 90-001).  The board treated
the noise policy as the "upper bound of acceptable noise impacts" for
PCW's project. 

[17] To the
extent Johnson challenges the use of the DEP noise policy standard to guide the
design of the substation, the argument misapprehends a fundamental aspect of
the engineering enterprise, which often requires a system to meet a design
constraint (here, sound). 

[18] The wall was
initially added to eliminate a "pure tone" identified by earlier
modeling.  A "pure tone"
condition is defined by the DEP noise policy as "when any octave band
center frequency sound pressure level exceeds the two adjacent center frequency
sound pressure levels by [three] decibels or more."  Policy 90-001.  PCW's experts described a pure tone as
"an objectionable squealing sound" like what one might hear from a
fan.

[19] In the final
environmental impact report, PCW's experts stated that "no [DEP]-defined
pure tones are anticipated from operation of the Project substation at any
modeled receptor."  Nonetheless,
they explained, the wall would continue to serve as a noise barrier to mitigate
sound levels following what the experts described as "a [ten]-foot
elevation reduction across the balance of the substation area."

[20] PCW has not
yet contracted with equipment manufacturers because the substation equipment will
be custom-built.  The board's approval
pursuant to G. L. c. 164, § 69J, is only the first of many
licenses, permits, and approvals that PCW must obtain before beginning
construction.  See Alliance II, 457 Mass.
at 689 & nn.38, 39 (discussing additional local and State permits that
applicant must seek).  To order the
custom-built equipment at this initial stage would be premature, according to
PCW. 

[21] Johnson
asserts that the Edison Electric Institute Noise Guide is unreliable.  However, PCW's experts maintained that the
formulas and information within the guide are still generally accepted by the
engineering community.  Johnson presented
no contrary evidence.

[22] Vineyard
Wind I is a separate project designed to bring wind farm energy resources to
the New England electric grid.  The same
experts who provided reports and testimony for the present project worked on
the plans for the Vineyard Wind I substation. 
In developing their opinion on the quieted specifications for PCW's
substation's equipment, the experts used certain equipment specifications from
Vineyard Wind I and incorporated further noise-reducing modifications based on
suppliers' earlier representations.  One
of the experts explained:    
"[W]e
started with quieter equipment [from the Vineyard Wind I project], and then the
company was greatly informed by the procurement process that we recently went
through for Vineyard Wind I, where they did talk to . . . actual
suppliers who can make this equipment, and they asked for . . .
all the noise-reduction bells and whistles that they could get on that
equipment.  And that informed us about
the reality of how low we could go in modeling here."

[23] The expert
continued:
"So this is
aggressive.  This is very aggressive, in
terms of the sound power levels that we're showing in here in the
modeling. . . .  I've done
a lot of modeling of transformers, and [ninety-three] decibels sound power for
a 450-MVA transformer is extremely quiet.
"So we feel
very confident, comfortable that, in terms of what's commercially available out
there from companies that can make this and supply this in a timeline that's
going to meet the company's goals, that this is as quiet as we can get."  

[24] The transformers
are anticipated to be the loudest components of the substation.

[25] Pressed by
the board whether the equipment could be manufactured to be even quieter than
the specifications set forth in their modeling, the experts opined that they
did not believe that further reductions would be consistent with the constraint
that the equipment be commercially available on the timetable needed by the
proposed project.

[26] Because the
specifications were based on equipment not yet procured and because the sound
levels were lower than those proposed for the Vineyard Wind I project, the
board expressed "skepticism" whether PCW's manufacturers would be
able to produce the modeled quieted equipment.

[27] The
condition instructs PCW to communicate any additional noise mitigation measures
with Johnson in an attempt to reach consensus. 

[28] Johnson's
reliance on Tebo v. Board of Appeals of Shrewsbury, 22 Mass. App. Ct. 618, 623
(1986), is misplaced.  There, the Appeals
Court concluded that the failure of a zoning board of appeals to adopt an
express plan for dust mitigation despite substantial opposition based on
anticipated dust from the proposed facility and despite a town bylaw requiring
agreement on such a plan prior to issuance of a special permit was
impermissible.  Id. at 624-625.  Assuming arguendo that Tebo applies outside
of the zoning context, the board here has not left a substantive decision open
for future determination; the board approved PCW's project as proposed,
including the requirement that the sound level increase at Johnson's home be no
more than eight dBA.  
      Should the substation, after PCW has
procured and installed the equipment and implemented noise mitigation measures,
cause ambient sound levels at Johnson's residence to increase beyond eight dBA,
PCW must submit a project change petition, which would reopen the process and
allow for public hearings where Johnson would be able to participate, as both
the board and PCW acknowledged during the procedural evidentiary hearings and
at oral argument before this court.  See
GreenRoots, Inc., 490 Mass. at 749-750 (describing project change procedure
taken by board when petitioner sought to relocate site); Brockton Power Co. v.
Energy Facilities Siting Bd., 469 Mass. 215, 217-219 (2014) (affirming board's
conditional final decision and project change proceedings, which included
evidentiary hearings).